IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| ROBERTA PHILLIPS, ) | Civil Action No. 3:11-1085-MBS-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB on December 21, 2006, alleging disability as of October 31, 2004. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on May 7, 2009, at which Plaintiff appeared and testified. On August 10, 2009, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff can do.

Plaintiff was fifty-five years old at the time of the ALJ's decision. She has a high school education, and past relevant work as an accountant and supervisor. See Tr. 24, 108, 112. Plaintiff

alleges disability due to fibromyalgia, cervical disc disease, obesity, depression, and anxiety. See Tr. 16, 109-112.

The ALJ found (Tr. 16-25):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since October 31, 2004, the alleged onset date (20 CFR 404.1571, *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, cervical disc disease, obesity, depression, and anxiety (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional to perform medium work. Specifically, she can lift/carry 50 pounds occasionally and 25 pounds frequently, stand six hours in an eight hour workday, sit six hours in an eight hour workday, and walk six hours in an eight hour workday. She can never climb ladders, ropes, or scaffolds and is limited to no more than occasionally balancing. She is limited to frequently climbing ramps and stairs, stooping, kneeling, crouching, and crawling. She must avoid concentrated exposure to hazards. She is limited to simple, one to two step tasks and can have no more than occasional contact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 3, 1954 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age. (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2004 through the date of this decision (20 CFR 404.1520(g)).

On March 10, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 1-3). Plaintiff filed this action in the United States District Court on May 5, 2011.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

**MEDICAL RECORD**

Dr. John R. Wieder of Hillcrest Family Practice has treated Plaintiff since approximately January 2004. He treated Plaintiff for various conditions and prescribed Temazepam for her sleep

problems, Darvocet and Lortab for chronic back pain, and Xanax and Cymbalta for depression and anxiety. Tr. 288-293.

On June 24, 2004, Dr. Carol Nichols of Carolina Neurology evaluated Plaintiff for complaints of chronic, severe headaches. Plaintiff reported headaches once or twice per week that lasted up to one to two days at a time. She was using Aleve and Darvocet for her pain. Plaintiff also reported feelings of depression and chronic low back pain. She indicated she had lost approximately one hundred pounds, but became very ill and gained about twenty-five pounds back. Her medications were Soma and Lortab for back pain and Xanax for anxiety. Dr. Nichols's impression was common migraine, chronic low back pain, and mild depression. Verapamil was prescribed and she was given a prescription for Imitrex for breakthrough migraine. Dr. Nichols indicated that when Plaintiff's headaches were controlled she would be offered an anti-depressant such as Effexor or Lexapro because Plaintiff had not received benefits from Paxil, Zoloft, or Wellbutrin in the past and did not like the side effects of those medications. Tr. 275-285.

On July 27, 2004, Dr. Nichols noted that Plaintiff had improvement with her migraines, and continued to have depression which seemed to revolve around family problems. Dr. Nichols advised Plaintiff to continue taking Verapamil and Maxalt for migraines and to begin taking Effexor for depression. Tr. 283.

On September 13, 2004, Dr. Nichols reported Plaintiff had effective relief of her migraines and depression, but she had spasm in her low back and some tenderness over her sacroiliac on the right. She also complained of intermittent episodes in which her legs went numb and would not hold her upright. Dr. Nichols diagnosed sacroiliac strain with probable referred pain and controlled migraine. An injection to Plaintiff's right sacroiliac produced some immediate relief of pain. Dr.

Nichols continued Plaintiff's medications and gave her samples of Bextra and Ultracet for musculoskeletal pain. Tr. 282.

On September 21, 2004, Plaintiff underwent an MRI of her lumbar spine upon recommendation and order of Dr. Nichols. The MRI revealed degenerative changes with a mild disc bulge at L4-L5 without evidence for lateral recess or spinal stenosis and an ovarian cyst and perhaps a small synovial cyst. Tr. 237. On December 6, 2004, Dr. Wieder noted that Plaintiff, who is five feet, one inch tall, weighed two hundred and one pounds. Tr. 291.

On January 12, 2005, Plaintiff was taken to the hospital after falling out of bed, hitting her head, and having seizures. A CT scan showed a right-sided pelvic abscess which appeared to be blocking her right ureter with moderate hydronephrosis and hydroureter. Tr. 267-268. A right percutaneous nephrostomy tube was placed on January 17, 2005, and she was discharged from the hospital on January 21, 2005. Tr. 248-249, 267-268. Plaintiff had her nephrostomy tubes replaced on January 28 and February 21, 2005. Tr. 227-230, 231-236.

Plaintiff was treated in the emergency room on March 14, 2005 for severe abdominal pain and vomiting. Tr. 238-247. On April 14, 2005, Plaintiff was treated at the emergency room for "family conflicts" and "frustrat[ion] with health problems." Tr. 213-221.

Plaintiff was hospitalized from April 13 to 16, 2005, and underwent right ureteral reimplantation, psoas hitch, and lysis of adhesions. It was noted that Plaintiff had her right ovary removed several weeks prior and at retrograde there was significant ureteral injury. Tr. 222-226.

On July 14, 2005, Plaintiff reported to Dr. Nichols that she had unexplained confusion, "non-sensible" speech, and a "drawing" of her left limbs. Dr. Nichols diagnosed migraine and

5

episodes of confusion, questioning complex partial seizures versus flight of ideas secondary to bipolar disorder. Depakote was ordered. Tr. 280.

On August 17, 2005, Plaintiff complained of increasing back pain with radiculopathy down her right leg. Dr. Wieder's examination revealed severe tenderness across Plaintiff's L5 spine, and positive straight-leg lifting on the right. He renewed Plaintiff's prescriptions for Percocet, Flexeril, and Imitrex. Dr. Wieder stated that Plaintiff had migraines, chronic cystitis, severe anxiety and depression, chronic phlebitis with a history of embolic disease, hypertension, fibromyalgia, degenerative disc disease with radiculopathy to the right lower extremity, scoliosis, and a seizure a couple of weeks prior possibly due to damage done during surgery in which her ureter was cut. He opined that she was totally unable to work and had major medical conditions requiring many medications. Dr. Wieder wrote that he asked Plaintiff to go to the Social Security office to apply for disability as he did not think she would be able to return to work. Tr. 294. Plaintiff reported she was hurting everywhere on September 26, 2005, at which time Dr. Wieder renewed her prescriptions. Tr. 295.

On October 7, 2005, Plaintiff was treated in the emergency room for Xanax withdrawal and benzodiazepine dependence. Tr. 148-149, 181-202. She was noted to have depressive disorder with a GAF at discharge of 55. Tr. 183.

Dr. Nichols noted on October 27, 2005 that Plaintiff was doing extremely well following her hospital discharge. Plaintiff was diagnosed with migraine, seizure disorder, and bipolar disorder. Tr. 279. On November 29, 2005, Plaintiff saw Dr. Wieder who expressed disbelief at the amount of medication Plaintiff was taking, indicated that she looked bad and exhausted, and noted Dr. Nichols would continue to see Plaintiff for a seizure disorder. Tr. 296.

On January 31, 2006, Dr. Nichols reduced Plaintiff's Depakote dosage as Plaintiff had a tremor that was probably secondary to Depakote toxicity. Topamax was prescribed. Tr. 278. On March 1, 2006, Plaintiff reported improving headaches until two weeks prior when she had a conflict with her daughter. She reported she was upset, not sleeping well, and had increased headaches requiring her to take Imitrex "essentially every day." Dr. Nichols diagnosed Plaintiff with migraine, seizure disorder, bipolar disorder, and tremor improved with reduced Depakote. Tr. 277. On June 7, 2006, Dr. Nichols indicated that Plaintiff was doing much better after having reconciled with her family. Plaintiff reported only one severe migraine, but complained of daily headaches for which she was taking Tylenol. Tr. 276.

On December 22, 2006, Plaintiff was evaluated by Dr. Kevin Tracy, who specialized in internal medicine and rheumatology. Plaintiff complained of all over stiffness which lasted for about an hour in the morning, and swelling in her knees, forearms, and ankles. Dr. Tracy noted that Plaintiff had all the tender trigger points, but did not have proximal or distal weakness. He prescribed Lortab and Relafen. Tr. 300.

On January 22, 2007, Dr. Tracy stated that Plaintiff had osteoarthritis involving her cervical and lumbosacral spines, fibromyalgia, and osteoarthritis of her knees. Plaintiff reported she had pain of nine out of ten. Laboratory studies indicated that Plaintiff did not have lupus or rheumatoid disease. Norco and Flexeril were prescribed. Tr. 299.

On January 24, 2007, Dr. Nichols completed a questionnaire in which she indicated that Plaintiff had a racing thought process, normal thought content, worried and anxious mood and affect, adequate attention, adequate concentration, and adequate memory. She wrote that Plaintiff had

"episodic disturbances associated with bipolar disorder. At times she functions normally, but has breakthrough psychotic episodes." Tr. 301.

Dr. Wieder completed a questionnaire on January 24, 2007, in which he found that Plaintiff had distractible thought process, obsessive thought content, worried and anxious mood and affect, poor attention and concentration, and adequate memory. Dr. Wieder indicated that Plaintiff was able to relate and communicate adequately and did not have any significant memory or concentration deficits. Tr. 302.

Dr. Dale Van Slooten, a State agency physician, reviewed Plaintiff's records and completed a Physical Residual Capacity Assessment on February 14, 2007. He opined that Plaintiff was capable of lifting and carrying fifty pounds occasionally and twenty-five pounds frequently; standing/walking about six hours in an eight-hour workday; and sitting about six hours in an eight-hour day. He also thought that Plaintiff could never climb ladders, ropes, or scaffolds; could frequently perform all other postural activities; and that she needed to avoid even moderate exposure to hazards (based on her seizure history). Tr. 303-310.

On March 1, 2007, Dr. Tracy noted that Plaintiff was feeling better and had a pain level of eight. He prescribed a trial of Lyrica to help Plaintiff with fatigue and pain. Tr. 386.

Dr. Ron O. Thompson, a psychologist, performed a consultative examination on March 9, 2007. He noted that Plaintiff was somewhat fidgety and engaged in frequent hand wringing, and she had a depressed mood and a sad and tearful affect, although she brightened slightly at one point. Tr. 312. Memory testing indicated that Plaintiff's visual memory was in the borderline range, she had delayed recall and verbal memory in the extremely low range, and general memory falling well below the remainder of memory index scores with the exception of attention and concentration. Tr.

8

314. Dr. Thompson opined that Plaintiff could attend and focus for short periods of time, but would become distracted and lost concentration over protracted periods of time (one and on-half to two hours). Tr. 314. Dr. Thompson's diagnostic impression was affective disorder with major depressive features, moderate, secondary to general medical condition; adjustment disorder with generalized anxiety features, moderate; and attention deficiency secondary to mood disorder and general medical condition. Tr. 315.

Dr. Debra Price, a State agency psychologist, reviewed Plaintiff's records and completed a Psychiatric Review Technique Questionnaire on March 28, 2007. She opined that Plaintiff had medically determinable impairments causing moderate restrictions of daily activities; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. Tr. 326. Dr. Price opined that Plaintiff retained the ability to attend to tasks for as much as two hours or longer, and remained capable of performing simple, repetitive unskilled work activity without extended contact with the general public. Tr. 328. In a Mental Residual Functional Capacity Assessment completed the same day, Dr. Price found Plaintiff to be moderately limited in a number of abilities. Dr. Price stated that Plaintiff's allegations were credible and supported by medical evidence of record, and indicated that Plaintiff's symptoms, while severe, would not preclude her from carrying out basic work functions. Tr. 330-333.

On May 8, 2007, Dr. Tracy wrote that he did not think Plaintiff would "have any further recovery from this situation as her condition is permanent." Tr. 384. He also completed a questionnaire the same day indicating he treated Plaintiff on a regular basis between December 22, 2006 and March 1, 2007 for osteoarthritis of her cervical and lumbar spine, fibromyalgia, and fatigue.

9

He stated that Plaintiff's conditions were confirmed by x-ray findings, examinations, and symptoms of fibromyalgia and fatigue being present for five years. Dr. Tracy estimated that Plaintiff's pain and level of fatigue were moderate and indicated he had not been able to completely relieve Plaintiff's pain with medication without unacceptable side effects. Dr. Tracy opined that Plaintiff could sit for four hours in an eight-hour workday; could stand and walk for one hour in an eight-hour workday; would need to get up and move around every one to two hours for five minutes at a time; and could lift and carry up to five pounds frequently and five to twenty pounds occasionally. Dr. Tracy stated that Plaintiff could not do a full-time competitive job that required activity on a sustained basis, and she was capable of tolerating only low stress work. He wrote that Plaintiff experienced pain, fatigue, and other symptoms severe enough to interfere with attention and concentration. Dr. Tracy estimated that Plaintiff would likely be absent two to three times a month, and she would require unscheduled breaks every three to four hours for fifteen to thirty minutes at a time. He further found that Plaintiff would need to avoid temperature extremes and humidity; would need to avoid heights, and could perform no kneeling, bending, or stooping. Dr. Tracy stated that the earliest these limitations applied was December 22, 2006. Tr. 346-353.

On June 7, 2007, Dr. Tracy noted that Plaintiff's pain level was down to a seven, and refilled her current medications. Dr. Tracy advised a follow-up in three months. Tr. 382.

State agency physician Dr. Seham El-Ibiary completed a physical RFC assessment on June 12, 2007. He opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand/walk about six hours a day; sit about six hours a day; could never climb ladders, ropes, or scaffolds; could occasionally balance; and would need to avoid even moderate

10

exposure to hazards. Tr. 354-361. On June 25, 2007, Dr. Robbie Ronin (a State agency psychologist) made findings that were essentially the same as those of Dr. Price. Tr. 362-379.

On September 20, 2007, Dr. Tracy reported that Plaintiff had done doing pretty well, her pain remained at a seven, and Plaintiff was working at a restaurant. Tr. 381. On January 7, 2008, Dr. Tracy stated that Plaintiff's pain level of nine was "actually better" although she was still stiff for about three hours in the morning. He noted that Plaintiff had tenderness along the medial border of her knee and right elbow, and diagnosed her with osteoarthritis and fibromyalgia. He refilled her prescriptions for Relafen, Norco, and Flexeril. Tr. 391. On May 15, 2008, Dr. Tracy reported that Plaintiff's pain was down to an eight, but her fatigue was worse. He indicated that Plaintiff continued to take medications prescribed by Dr. Nichols, noted that her arthritis and fibromyalgia were about the same, and added a prescription for Restoril. Tr. 389.

## **HEARING TESTIMONY**

Plaintiff initially testified that she last worked in October 2004, but then admitted she had worked in early 2008. Tr. 31-32. Plaintiff stated that she had to stop working because of pain and depression. Tr. 32-33. She said she took medication, which sometimes caused her thoughts to be "all messed up." Tr. 33. She estimated that she could sit for thirty to forty-five minutes at one time, walk ten minutes at one time, and stand fifteen to twenty minutes at one time. Tr. 36. Plaintiff testified that her typical daily activities included reading the Bible, putting laundry in the washing machine, doing dishes, and folding clothes. Tr. 36, 39. She stated she drove and went shopping once a week. Tr. 40. Plaintiff testified she was able to bathe and dress herself most of the time. Tr. 37. She said that she visited with friends and family occasionally, and that she had taken a trip out of state sometime in the three years prior to the hearing. Tr. 41. When asked about working in a restaurant

11

in 2007, Plaintiff said that her husband, daughters, and granddaughter ran the restaurant, but that she did not. Tr. 38.

## DISCUSSION

Plaintiff alleges that: (1) the ALJ erred in discounting the opinions of her treating physicians (Dr. Tracy and Dr. Wieder); (2) the ALJ improperly relied on VE testimony; and (3) the ALJ erred in evaluating her credibility. The Commissioner contends that substantial evidence[1] supports the final decision that Plaintiff is not disabled within the meaning of the Social Security Act.

    A.    <u>Treating Physicians</u>

Plaintiff alleges that the ALJ erred by not giving logically or legally sufficient reasons for discounting the opinions of her treating physicians (Dr. Wieder and Dr. Tracy). The Commissioner contends that the ALJ properly weighed the opinion evidence.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other

---

[1]Substantial evidence is:
    evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

12

substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount Dr. Wieder's opinion is supported by substantial evidence and correct under controlling law. As noted above, Dr. Wieder opined in August 2005 that Plaintiff was totally unable to work and that she should go to the Social Security office to apply for disability because he did not think she would be able to return to work. Tr. 294. The ALJ properly discounted this as it is an issue reserved to the Commissioner (Tr. 23) and thus was not entitled to any special weight or significance. See 20 C.F.R. § 404.1527(d)(1); Castellano v. Secretary of Health and Human Servs., 26 F.3d 1027 (10th Cir. 1994). Additionally, the ALJ properly discounted this opinion because Dr. Wieder's treatment notes showed very limited findings, as discussed above. The ALJ also properly discounted this opinion because it appears (as there were very few objective findings by Dr. Wieder) to be based on Plaintiff's subjective statements.

13

The ALJ's decision to discount Dr. Tracy's opinion is not supported by substantial evidence. The ALJ stated that he discounted this opinion because it was not supported by evidence of the record including that Plaintiff's pain level improved with medication. Review of Dr. Tracy's notes (as discussed above), however, reveals that Plaintiff consistently reported to Dr. Tracy pain levels of seven, eight, and nine out of ten. The ALJ also discounted Dr. Tracy's opinion because it appeared that Dr. Tracy was sympathetic to Plaintiff and based his opinion more on Plaintiff's subjective allegations than on objective findings. Tr. 23. It is unclear from the opinion why the ALJ thought that Dr. Tracy was overly sympathetic. Dr. Tracy stated objective reasons for his diagnoses. Tr. 346. The ALJ also discounted Dr. Tracy's opinion because it was not in compliance with SSR Ruling 00-4p. That Ruling, however, clarifies standards for the use of vocational experts and specialists. It is simply unclear from the ALJ's decision how Dr. Tracy's opinion is not in compliance with SSR 00-4p. This action should be remanded to the ALJ to properly consider Dr. Tracy's opinion in light of all of the evidence.[2]

B.  Reliance on VE Testimony

Plaintiff alleges that the ALJ improperly relied on VE testimony at step five[3] because there is a potential conflict as to the VE's testimony which the ALJ failed to clarify. Plaintiff argues

---

[2] As it is unclear that the ALJ properly evaluated the opinion of Dr. Tracy, it is also recommended that this action be remanded to consider Plaintiff's credibility in light of all of the evidence. The ALJ discounted Plaintiff's credibility, at least in part, based on the medical record.

[3] In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

14

that there is a conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony in that each of the three jobs identified by the VE has a reasoning level higher than allowed by the ALJ's limitation of Plaintiff to "simple, one to two step tasks." The Commissioner argues that "because Plaintiff's limitation to 'simple, routine, and repetitive tasks' was consistent with the unskilled (SVP-2 jobs) identified by the vocational expert, the vocational expert's testimony did not conflict with the DOT." Commissioner's Brief at 17.

Here, the RFC found by the ALJ does not limit Plaintiff to simple, repetitive tasks, as argued by the Commissioner. Instead, the ALJ limited Plaintiff to "simple, one to two step tasks." Tr. 19. The DOT indicates that the jobs (identified by the VE) of kitchen helper (DOT 318.687-010) and production helper (DOT 529.686-070) have a reasoning level of 2 and the food service worker job (DOT 319.677-0144) has a reasoning level of 3. The limitation assessed by the ALJ, however, correlates with a reasoning level of 1 in the DOT. The DOT defines a reasoning level of 1 as requiring a worker to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." U.S. Dept. of Labor, Dictionary of Occupational Titles, App. C § III, 1991 WL 688702 (Fourth Ed. Rev.1991). A reasoning level of 2 indicates that the job requires the worker to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and to deal] with problems involving a few concrete variables in or from standardized situations." Id. A reasoning level of 3 indicates that the job requires the worker be able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form [and to deal] with problems involving several concrete variables in or from standardized situations." Id.

Thus, despite the VE's testimony to the contrary,[4] there is a conflict between the VE's testimony and the DOT. Although it may be that some of the jobs identified by the VE can be performed at a reasoning level of 1, it is unclear from his testimony and the ALJ's decision that there are jobs existing in significant numbers in the national economy that Plaintiff can perform with the limitation to one to two step tasks.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to evaluate the opinion of Plaintiff's treating physician (Dr. Tracy) and Plaintiff's credibility in light of all the evidence, and (if necessary) to determine at step five whether there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 14, 2012
Columbia, South Carolina

---

[4] The ALJ asked the VE if his answer (identifying jobs a claimant with Plaintiff's limitations could perform) was consistent with the DOT, to which the VE replied "Yes." Tr. 45.